IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

PLEAS GRIFFIN,

    Plaintiff,

v.

ST. CLAIR COUNTY, ILLINOIS *et al.*,

    Defendants.

Case No. 3:17-cv-01169-JPG-RJD

## MEMORANDUM AND ORDER

**J. PHIL GILBERT, DISTRICT JUDGE**

    St. Clair County was operating at a deficit and needed to make budget cuts. One area the County aimed to slash was the Bailiff's Fund, which was in the red by an average of $10,000 to $14,000 per month. (Moore Dep. 11:13–12:4, ECF No. 55-7.) So the County told their Sheriff to choose five bailiffs to fire, and the Sheriff then negotiated that number from five to three. (*Id*. at 12:5–21; Battoe Dep. 13:20–14:9, ECF No. 55-4.) One of those three was a man who often fell asleep on the job and was no longer mobile enough to perform some of the job's physical duties. (*Id.* at 20:3–22:8.) Another was a man who basically volunteered to leave because he wanted to pursue his passions as an "entertainer." (*Id*. at 23:13–24:6, 29:2–16.)

    The third was plaintiff Pleas Griffin. Griffin has a documented history of problems at his courthouse. When he was assigned to the domestic violence courtroom, the domestic violence victim advocates told Griffin's supervisor that Griffin was behaving poorly and making inappropriate comments about the advocates' legs and dresses. (*Id*. at 30:3–14, 31:5–9.) Griffin's supervisor then warned Griffin about that behavior, but within a week, the supervisor received more complaints. (*Id*. at 31:10–32:5.) So the supervisor permanently removed Griffin from the domestic violence courtroom and assigned him to a metal detector in the courthouse instead. (*Id*.

at 31:6–11, 40:19–22.)

But that was not the end of the matter. The Domestic Violence Prevention Center had an office near that metal detector where its advocates met with victims who came into the building. (*Id*. at 40:22–41:1.) And shortly after Griffin's reassignment, the advocates said that they could overhear Griffin complaining about being removed from his courtroom and the Violence Prevention Center's connection to that reassignment. (*Id*. at 41:1–9.) So the supervisor reassigned Griffin yet again. The supervisor then filed a written reprimand of Griffin, stating that Griffin was insubordinate by publicly complaining about his supervisor to people around the courthouse rather than going up the chain-of-command to the supervisor's boss. (Def.'s Mot. Summ. J., Ex. K, p. 1, ECF No. 55-11.)

There are at least two more incidents in the record as well. First, around the same time as the aforementioned incident, Griffin attended a press conference in East St. Louis, Illinois in uniform—indicating that he was officially representing the Sheriff's Department—without the knowledge or consent of any of the Department's command staff or the Sheriff himself. (*Id*. at p. 2.) And second, a county judge requested that Griffin no longer be assigned to her courtroom after an incident involving a threat by a citizen against that judge. (Battoe Dep. 42:13–45:8–14, ECF No. 55-4.) With all of these issues in mind—and particularly because the Sheriff could not adequately assign Griffin to multiple locations around the courthouse, making him an inflexible employee compared to the others—the Department selected Griffin as the third bailiff for termination. (*Id*. at 45:25–46:21.)

For that, Griffin sued the both the County and the Sheriff. One claim is for age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq*. Another is for race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e *et seq*. And the last is for race discrimination under 42 U.S.C. § 1983 and the Fourteenth Amendment. At its core, Griffin's theory is that his aforementioned behavior was all a pretext for his firing—and that the County actually fired him because he is elderly and an African-American. That theory arises from Griffin's allegations that his supervisor did four things: (1) he once compared African-Americans on the bailiff's radio system to the sitcom "Amos 'n' Andy"; (2) he tried to get all of the bailiffs to use computers instead of paper, which Griffin says discriminates against the elderly; (3) he was unhappy when Barack Obama became President, although it is not clear from the record why; and (4) he allegedly said that elderly bailiffs should retire.

The defendants have now moved for summary judgment. (ECF No. 54.) They are entitled to summary judgment if they "show that there is no genuine dispute as to any material fact and [if they are] entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). But while reviewing the material facts, the Court must construe the evidence in the light most favorable to the nonmoving party—here, Griffin—and draw all reasonable inferences his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

But even viewing the facts here in the light most favorable to Griffin does not salvage his case. Griffin must prove his age and race discrimination claims through either of two methods: (1) direct evidence of the employer's discriminatory motive; or (2) the indirect "burden-shifting" approach from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003); *Hildebrandt v. Illinois Dep't of Nat. Res.*, 347 F.3d 1014, 1036–37 (7th Cir. 2003) (claims for age discrimination under the ADEA are

subject to the same framework as race discrimination claims under Title VII and § 1983).

Here, because there is no direct evidence in the record of a discriminatory motive by the defendants, Griffin must rely on the burden-shifting approach. And that approach requires Griffin to first make a prima facie case that (1) he is a member of the protected class; (2) he was performing at a satisfactory level; (3) he was subject to an adverse employment action; and (4) he was treated less favorably than younger, similarly situated employees. *Id*. at *Krchnavy v. Limagrain Genetics Corp*., 294 F.3d 871, 875 (7th Cir. 2002). If Griffin can do that, then the burden shifts to the County and Sheriff to show that they fired Griffin for a legitimate, nondiscriminatory reason—and Griffin can rebut that reason by arguing that the defendants' offered reason was actually a pretext for discrimination. *Id*. (citing *Krchnavy*, 294 F.3d at 876).

But we cannot even reach the pretext stage here, for Griffin has not made a prima facie showing that he was performing his job at a satisfactory level, nor could a reasonable jury find as much. Griffin was banned from two courtrooms at his place of work. He could not work around women from the Domestic Violence Prevention Center because of the way he treated them. He could not work at a metal detector that processed people into a floor of the courthouse. And he was disciplined for insubordination. So when the County was faced with budget cuts and had to fire three bailiffs, the record makes clear that they chose the person whom was performing his job so unsatisfactorily that he was banned from multiple locations at his job site and accordingly had little flexibility compared to other employees. This is not a close case.

And Griffin makes no compelling argument to the contrary. First, he argues that the Sheriff offered him a part-time job after his termination—but that evidence comes from the County Director of Administration's supposed "understanding" that the Sheriff did such a thing, which is wholly contradicted by Griffin's statement at his own deposition that he never received

4

such an offer. (*Compare* Moore Dep. 32:11–16, ECF No. 58-1 *with* Griffin Dep. 134:9–23, ECF No. 55-9.) Second, Griffin asserts that the County conceded to the EEOC in an early position statement that Griffin "may have performed his job well enough to meet…legitimate expectations"—but as Griffin should know, the word "may," especially when used in legal documents, only expresses the possibility that something is true. (ECF No. 58-9, p. 4.) The County's statement is not an admission.

Finally, Griffin cites to *Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 453 (7th Cir. 1998) for the proposition that what matters here is whether he was meeting his employer's expectations at the time of his discharge—yet here, the incident with the Domestic Violence Prevention Center and the subsequent insubordination happened three years prior to his termination. There are two problems with that argument. First, it does not account for Griffin's ban from the second courtroom. And perhaps more importantly, it discounts the fact that the bans were still in effect at the time of Griffin's termination—and at the time of termination, the County fired Griffin because they could not adequately assign him to different locations in the courthouse compared to the other bailiffs. (Battoe Dep. 45:25–46:21, ECF No. 55-4.) That is critical, as it is a clear indication of Griffin's unsatisfactory performance as an employee. Because that issue is dispositive, the Court declines to address the other arguments in the defendants' motion.

For those reasons, the Court **GRANTS** the defendants' motion for summary judgment (ECF No. 54), **DISMISSES** this case **WITH PREJUDICE**, and **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED: MAY 29, 2019**

**s/ *J. Phil Gilbert***
**J. PHIL GILBERT**
**U.S. DISTRICT JUDGE**